Are you ready to proceed? Oh, yay. Oh, yay. Oh, yay. The Honorable Appellate Court, 5th District, State of Illinois, is now in session. The Honorable Justice Moore presiding, along with Justice Welch and Justice Vaughn. The first case this morning is 521-055, N. Ray, the marriage of Kunsemiller, arguing for the appellant cross-appellee, is Danielle Gruinger. Arguing for the appellate cross-appellant is Anthony Garavaglia. Each side will have 15 minutes for their main argument and 5 minutes each for their response. In other words, the argument time will be 15-15-5-5. Please note only the clerk is permitted to record these proceedings. Good morning, counsel. I understand this case has a cross-appeal, so we'll have 15-15 for each side and then 5-5-5 for each side on N. Ray Bevel. Is the appellant ready to proceed? Yes, Your Honors. Please state your name and you may proceed. Daniel J. Gruinger for the appellant, Beverly Kunsemiller, now known as Beverly Parker. May it please the court, opposing counsel, on February 19, 2019, an order was entered by the trial judge in this case requiring that the parties provide all expert witness reports exchanged by March 15, 2019. This case was originally set in May of 2019. After that order was entered, no such expert report was provided by Jeffrey's attorney. And even though Jeffrey had hired an expert in the case, he had not disclosed any reports. Prior to that, back in July of 2018, Beverly had disclosed her expert reports and she was ready for trial. When the case was called up in May of 2019, there was a very real possibility that Jeffrey's reports had not been provided. Even though his expert was sitting in the hallway at that time, that does not necessarily equate to being allowed to testify based on the fact that the judge could very well have presented his testimony based on failing to provide the reports. The trial judge in the case then spoke to the attorneys of record and they both indicated that they consented to the presentation of testimony and agreed to submit the matter to the court for ruling upon the argument of counsel. That's the preface paragraph of the order that was entered immediately after argument on that day, May 23, 2019. It also states in there that the parties have waived testimony on the pending issues. The first issue in this case is the trial judge ultimately vacated that order. I submit that she did so in error. A couple of things about that. First and foremost, one of the arguments that is made by Jeffrey in this appeal is that Jamie Mitchell did not have authority and I provided a number of cases dealing with the issue of an attorney's authority, both apparent and real, for purposes of resolving issues that bind the client. I'm not going to belabor by going through all those cases that I put in my brief, but I do want to indicate one thing very clearly. Certainly the judge believed that Jamie Mitchell had that authority or she would not have entered this order on May 23, 2019. In addition, she wouldn't even have heard the argument. It was clear to the judge at that time that Jamie Mitchell did have authority to do that. One of the things that's cited by Jeffrey in his argument with respect to why the judge had the discretion to be able to vacate it was the judge quoting the fact that neither party nor council signed the order on May 23, 2019. Now two things about that. First of all, the agreement that had been agreed to by the parties on May 23, 2019 was a procedural agreement. It was not a substantive agreement. They weren't entering into an agreement on all the issues and then signing off on it. The agreement was procedurally, we're going to waive our testimony on the pending issues in this case and we're going to agree to procedurally submit the information to the judge and have the trial judge decide. So it doesn't mean anything that neither party nor their council didn't sign this order of May 23, 2019. First of all, the lack of any signature other than the judge's signature doesn't indicate one way or another about the fact that there was an agreement with respect to the procedure. Secondly, it didn't stop the judge from signing the order on May 23, 2019. Clearly she believed that the parties had an agreement with respect to the procedure or again, she would not have entered the order. The expert report deadline had been set, as I indicated, on March 15, 2019. And an indication that Jeffrey was sitting out in the hallway for two hours on the morning for the arguments that were made in Jeffrey's brief in this matter and that his expert was ready to testify doesn't necessarily equate to his expert being allowed to testify based on the fact that they hadn't submitted the report of the expert in advance of the trial. Mr. Gerniger, what was the date of the hearing where Jeffrey claims he was out in the hall with his expert? What was that date? That was in May of 2019. That was two months after he was supposed to have submitted his expert's report. And what was the date of the hearing on the motion to vacate? The date of the hearing on the motion to vacate was August 6th of 2019. Was there actually a hearing on that day? Well, and so I supplied the appellate court with a statement from the court reporter indicating that there was no transcript from that day. And as a result, there was no hearing that day. In their argument, in Jeffrey's argument, he indicates that, well, you were not the attorney of record, which is true. I was not representing Beverly at that time. But, by the way, all these things happened. We actually did have argument. The problem is, there's, and that brings, I'm glad you brought that up because it brings me to a point I was going to make. There's no bystander's report. There's no agreed statement of facts presented by Jeffrey in this matter to supplement the record. All that exists with respect to what happened on that day is a statement. Well, shouldn't you have provided a bystander's report or some record? Well, the problem is I didn't know that anything had existed on that day until Jeffrey brings it up in his argument that something actually occurred on that day. And I submit that if he knows about something that occurred, and certainly my client wouldn't know that this occurred because apparently it all occurred in the back, then he should have generated an agreed statement of facts about what he claims occurred that I don't, that my client didn't even know occurred. So I mean, I submit that procedurally there's a problem here with respect to not providing even an affidavit from the judge because we don't know what happened. It's not anywhere in the record. The only assertions that we have are what Jeffrey puts in his brief in this matter. Well, the standard is of abuse of discretion, is it not? Yes, it is abuse of discretion. And how are we to know if there was an abuse of discretion if there's no record, there's no bystander's report? I mean, how do we grant your appeal, a ruling in favor of the appeal if we have no record? Well, one of the things that they focus on, that Jeffrey focuses on in his brief, and he's correct in this regard, is the court is supposed to do substantial justice. The problem, what I'm arguing with regard to this, is where's the substantial justice for Beverly when she's ready for trial, when she has her expert having provided his report ahead of time, and from Jeffrey's perspective, he gets out from underneath what ends up being to him a bad result, and he buys more time for his expert report to be produced. And I submit that the court did not consider the substantial justice that Beverly was entitled to in this matter. With regard to the issue of how to calculate the incomes of the parties, one of the things that the court says is that it is clear, and I'm quoting from page 14 of the 17-page order that the court entered in the case, paragraph number 49. She states at the bottom, after relying heavily on Ms. Young, expert Ms. Young, which was my client's expert, she says it is clear when Ms. Young was unsure if an expense was business or personal, she added the total amount to income. The court intends to do the same with respondent. The problem here is the court simply took Beverly's gross receipts and allowed no deductions for any expenses associated with her running her business. So the court did not treat the two the same. The court gave Jeffrey what she thought were reasonable deductions associated with it, which was actually borne out by Beverly's expert witness, who the judge relied on heavily with regard to that, but gave my client no deductions of any kind whatsoever. So she did not treat them the same. And even in Jeffrey's brief, he argues that on page 36 of his brief, he indicates, in the interest of fairness, Jeff proposes that if the court is inclined to include any additional expenses in his gross income, that he be assigned only one half of any telephone utility, and then he goes on for the types of expenses. And then he says this is essentially the same treatment he is proposing for Beverly, except he's not, because there's nothing that Beverly was entitled to in the way of deductions from her gross receipts, whereas with regard to Jeffrey, he received the benefit of some of those deductions. Now, he didn't get 100% of the deductions that he had. His gross receipts were in excess of $400,000 in one particular year, and he ended up with an income of $250,000. So he got a number of his deductions taken off of his gross receipts, but she didn't. And it's the disparity in the treatment between the two that we're indicating resulted in error in this matter. That's with respect to the second issue that I have put into my brief. Regarding the third issue about college education expenses, I find it interesting that the judge in its final order in this matter stated that with regard to college education expenses, in paragraph 56 on the very last page, the judge states, the court denies the petition for non-minor support. The court must be able to weigh factors including the financial resources of the child and the child's academic performance. No such evidence or testimony was presented at trial. I pointed out in my brief that in fact there was evidence to those things that was addressed that was provided by Mr. Courtney in this case, who represented Beverly at the time of the trial. And maybe the judge just missed him or glossed over him or whatever the case may be, but there was evidence to that effect was put into the court's record. And I would note too that on the May 23rd, 2019 order that was ultimately vacated in paragraph seven on the second page, it specifically states that after argument, the court says that the parties agree that Jeffrey shall continue to apply the parent plus loans for each of the children at the appropriate time to cover one-third of each child's college expenses after deduction of scholarships and grants. So the court had enough information in the May 2019 order to make a determination with regard to non-minor education expenses. But now in the final hearing in this matter, the court comes back and says, I don't have enough information to make a determination regarding to non-minor education expenses. So I submit that that too was an error that was made in this case by the trial judge. Lastly, of course, the request for attorney fees is based on the respective incomes of the parties and the gross disparity between Jeffrey's income and Beverly's income in this matter. And that would be driven by the incomes of the parties that the court ultimately came to. Mr. Grenadier, the petition for attorney's fees did not state a specific amount you were requesting, did it? In Mr. Courtney's petition for attorney fees, I don't have it in front of me. I think he simply put in part of his request for other things like modification of child support and maintenance that he also be awarded attorney fees in this matter. I believe the parties submitted affidavits to the court with respect to the attorney fees that he was requesting in this case. He was initially granted a dollar amount from Jeffrey, which Jeffrey paid, but he was not granted any additional attorney fees. But part of the argument for attorney fees here is Jeffrey, even if it was a proper to grant the motion to vacate, Jeffrey caused a lot of the attorney fees associated with that initial appearance in May of 2019. Did the petition delineate the difference in work between prior to the March 19th order and after the March 19th order? Mr. Courtney just had the dates specifically stated in what he did for each. So it would have just been those entries that are leading up to and for that day on May 23rd, 2019, it would have been those entries he would be stating that Jeffrey should be responsible for as a minimum, which would reduce the amount that he paid prior to in the first award of attorney fees on the interim basis. Lastly, I would address just briefly in the time that I have left, I would address their request for sanctions in the counterpetition that they have in this matter, the cross appeal. I would request that by simply stating the purpose of sanctions is to provide discovery in the case. And in this particular case, it was in fact, Jeffrey who had been dilatory in failing to provide his expert opinion, witness information in this matter. Thank you. Thank you, counsel. Any questions? No questions. Justice Vaughn. One other question with regard to the petition for sanctions, wasn't that filed 10 months after the hearing they were requesting sanctions for? Yes. And I put that in my brief. It was even after the proofs were closed, they filed a motion for sanctions. So it wasn't timely in that regard either. Thank you. Thank you. We'll now hear from the appellee, Mr. Garavaglia, please state your name. Anthony Garavaglia. I am here on behalf of Jeffrey A. Ponsmiller, the appellee. May it please the court, Mr. Grueninger. First, to just directly respond to some of the arguments made by Mr. Grueninger today. His argument, his client's argument about the expert witness report and the dilatory disclosure of that having some impact on the court's decision whether or not to set aside the May 23, 2019 order is really a red herring and it's purely speculative. There is no reason to believe that Judge Campbell would have barred this witness, this expert witness who was there to testify that day from testifying. There had never been an interrogatory seeking the expert's opinion. There had never been a discovery deadline set. There had never been any indication that this witness's testimony would be barred. And in fact, there would be no reason in that order that wasn't signed by either party or either lawyer to waive testimony if there was a barrier to the witness being able to testify. And as further indication that Judge Campbell wasn't likely to bar this witness from testifying is the fact that when she exercised her discretion and set the order aside, she allowed for further discovery and she allowed for the supplementation of the expert's opinions, which both experts, Beverley's and Jeffrey's, then submitted. So the issue connecting that in some fashion as though Jeffrey and his lawyer were afraid no one's going to be able to testify is just simply speculative, not borne out by the record and not borne out by anything Judge Campbell did in setting aside her own order. And with regard to authority, I'm not aware of any case and I'm not aware of any case that Mr. Gruninger cited where the question bore upon an order not signed by either party, not signed by either party's lawyer, with no stipulations on the record, no testimony offered at all. Precisely how this order got entered, I really can't say. I wasn't counsel at the time. Mr. Gruninger was not either. But Judge Campbell had no issue setting it aside and allowing this case to be heard on the merits. And I was happy to see Mr. Gruninger concede that the standard of review here is abuse of discretion. Judge Campbell, who was there throughout this process, concluded that she should set aside this order, noting that no one signed it. And with regard to the substantial justice analysis, I mean, I think that all waves heavily in favor of Mr. Kunzmiller, my client. The results are just dramatically better for him now that the court actually heard the evidence. His monthly outlay for child support and maintenance is dramatically lower than it would have been had that May 23, 2019 order remained in effect. As a result, the child support arrearage because of the retroactive application of the modification is dramatically lower. In round numbers, about $32,000 lower. Substantial justice was done in this case after a hearing. After both experts participated and after the parties testified in open court over the course of two sessions. What about the motion to vacate? Was there a hearing at that motion? There was a hearing at that motion, Your Honor. There is no transcript of proceedings prepared. I did participate in that hearing. And I... Why is there no bystanders report then? No one asked for one to be prepared. There was, in fact, a hearing in Judge Gamble's chambers and I participated in it. Was testimony presented or was that just argument? There was no testimony presented, Your Honor. It was arguments of counsel based on applicable case law. The other side argued, frankly, that Section 2-1401 applies, it doesn't. The court concluded rightly that it was in her sound discretion to set this order aside on such terms and conditions as she saw reasonable, which she did. And those terms and conditions specifically allowed for our client's expert to expand his opinion. So there's no reason to believe that she was likely to bar his testimony in May of 2019. That's just pure speculation. Was the motion to vacate verified? The motion to vacate was not verified on the body of the motion. It was supported by an affidavit of Jeffrey Kunzmiller that was submitted of record a few days later. And the court relied upon... And there's no one that can refute or even tried to refute Mr. Kunzmiller's comments in support of setting aside the May 23 order. And I'm not... And Mr. Kunzmiller nor I are casting aspersions on anyone. I mean, his lawyer at the time, Ms. Mitchell, may have thought this is what he wanted her to do. It wasn't, and it certainly wasn't contemplated by him and his expert witness who were there to testify that day. May have been a mistake, but that's what transpired. With regard to the incomes of the parties, it's a bit ironic that Ms. Kunzmiller is upset about the court's assessment of her own income because her own expert, Ms. Kunzmiller's expert offered no opinion of Ms. Kunzmiller's income. She did offer some opinion of Jeffrey Kunzmiller's income, but none of Ms. Kunzmiller. And so what we were left with then, what the court was left with then in determining what Ms. Kunzmiller makes were Ms. Kunzmiller's documents that she did produce, which were corporate and personal income tax returns that are full of blatant falsehoods and inaccuracies that are outlined in the Apolyse brief. And just because of limitations of time, I'll just cite a couple. She testified that despite the fact that she claims thousands of dollars on her corporate tax returns and charitable contributions each year, one year I recall specifically $4,700, none of them are payments to charity ever. They are personal expenses that she pays out of her corporate account for things like fast food, clothing. She calls it charity. In one year, she mounts so many bad checks that her non-sufficient funds penalties in her corporate account were about $28,000. Just wasting money on NSF fees in that single year exceeded her maintenance payments by several thousand dollars. And that just really just starts to touch the surface of this. She reported to the IRS that her personal income, despite the fact she runs a business that she says she takes no money out of, was only her personal maintenance payments. Her tax returns are completely worthless in many respects, and yet she offered no expert testimony about what she makes. I think it's fair to say that both parties in this case were poor record keepers. It seemed like the judge was struggling to sort through the record keeping. Your Honor, that's no doubt. And that, unfortunately, was pointed out to these two individuals back in 2014, I believe, by both the trial court and the appellate court. At some point along the way, these folks need to improve their record keeping and tax reporting and so forth. And we submit that Jeffrey Kunstmiller did and continues to do so. I mean, the blatant falsehoods that Ms. Kunstmiller has committed, both in tax reporting and record keeping, are really pretty shocking. And then to have an expert witness who doesn't provide any testimony about her own income is surprising as well. But the other thing is, is that Mr. Kunstmiller's expert also had to correct the opinion of Ms. Kunstmiller's expert in certain respects, which we noted in the record, as regards to calculating Jeffrey Kunstmiller's income. She admitted that it was improper, as she had done initially, to assign him all of his W-2 income, all of his shareholder contributions, distributions, and all of the corporate profit each year. And she eventually backed off of that. And we submit that the correct way to calculate both parties' incomes is actually set forth in the Appley's brief, which for Mr. Kunstmiller basically would be his W-2 wages, his shareholder distributions, and also he's willing to be responsible for any of the personal expenses that his business pays, and half of those that are considered partially personal and have asked that Ms. Kunstmiller be treated similarly in that respect. With regard to the college expense question, and unless I've overlooked it, and I'm being serious about this, if Mr. Gruninger saw something I didn't, he should let me know. To my knowledge, the only thing in the record that addresses the college expenses for the prepared for the signature of one of the daughters that attaches some documents that are hearsay. There was no testimony elicited or offered regarding college expenses, and the court correctly determined that she didn't have the evidence available to even rule on that subject. I mean, an unsigned affidavit is just a potential affidavit. The adult child was not called to testify, and how are we to know that that child was even willing to sign this affidavit because she didn't? Again, if there is one out there with a signature on it, I don't have it. Didn't Jeffrey stipulate to the admission of that exhibit on November 14th? He did stipulate to the admission of the exhibit, Your Honor. But the way an unsigned affidavit with hearsay exhibits attached we believe should be given is essentially none, and that's what Her Honor in the trial court did. With regard to the attorney's fees question, a few things about that. If I understood the brief filed by my opponent, I believe that the total amount of attorney's fees charged to Ms. Kuntz-Miller throughout this process is around $38,000. Now, bear in mind, she wasted $28,000 on insufficient funds charges in one year. She never got that dramatically bad with it in the subsequent years, but it was in the thousands. As I recall, one year, roughly $3,500. She's wasted more money than she ran up in attorney's fees charges. And if you go through all the analysis, and we did in our brief, as to the factors that the trial court should apply in deciding whether or not to award attorney's fees, I mean, none of them weigh in Beverly's favor. In terms of income, hers is, in our opinion, and we believe the evidence bears out, substantially higher than she indicated. And in many years, it exceeds Jeffrey's. With regard to her needs, as mentioned, I mean, there's one year where she wasted more money than she got in maintenance. She mentioned some expenses that we articulated in her brief that are just simply, she even indicated, I believe her testimony in one instance was that it was mischaracterized. Some of them are just flat-out exorbitant for things like pet care. She claims she makes no money from her business. She lives in a $600,000, 4,500-square-foot home. Mr. Kunzmiller, Dr. Kunzmiller, after the divorce, moved in with his mom and dad for a couple of years, and now lives in a $1,400-square-foot home. The merits, if anything, are in favor of an award for attorney's fees for Dr. Kunzmiller, and not Beverly. But that also, we think that another question that bears on this attorney's fees situation is the fact that Beverly admitted, and the court found that she destroyed, just deliberately, discoverable evidence after it was sought in this case, and this is evidence that the court determined that was relevant to her own income and the income of Nirvana, and as a result, neither we, the appellee, nor the court, her honor, could properly make an assessment in certain respects about how much Beverly was actually making. To us, that's actually sanctionable behavior, which is why we asked for the sanction. But clearly, this person should not be awarded with a grant of attorney's fees, given the history of waste, given the history of exorbitant costs. Why was the petition for sanctions filed 10 months after the hearing? Why was the delay? There was really no strategic reason for that, your honor. But once we saw the court concluded, as we did, that Ms. Kunzmiller's actions were improper, that she deliberately destroyed discoverable evidence and hindered the court's analysis and ours, as a result, we thought it was appropriate to ask that she be sanctioned for that. I mean, there is a finding in the record, and no one's asked, no one's disputed that at all. I mean, I don't think that anyone at the trial level or the appellate level has even suggested that Beverly didn't destroy evidence in this case. That being the case, I mean, we think it's appropriate that a sanction be assessed against her, and certainly that she not be awarded any attorney's fees under these facts. So what sanctions are you requesting then? Usually on a discovery sanction, you get evidence barred or time extension or something like that. What are you requesting as a sanction? Well, ideally, her pleadings would be stricken. At this case, we would need to ask her request for relief at the appellate level be denied. Thank you. Any other questions, Justice Bond? No other questions, thank you. Justice Welch? No questions. Mr. Groninger, you'll now have five minutes for rebuttal. Thank you, Your Honor. Addressing the first issue with regard to the claim that it's speculative as to whether or not Jeffrey's expert would have been allowed to testify, one of the issues that was ongoing in this case was failure to provide that expert information in the expert report, which continued on even after the judge did vacate the order. I refer to, for example, Beverly's response to petitioner's motion to set aside vacate, which was filed July 9th, 2019 in this matter. It specifically stated that in paragraph two, petitioner's attorney, although president of the courthouse, testimony was not anticipated as the petitioner had failed to comply with this court's prior orders regarding expert discovery. He brings it up at that, Mr. Courtney brings it up at that point in time because the only thing the judge afterwards allowed the parties to do was to supplement the expert's testimony. And in fact, my client filed a motion to prevent the Jeffrey's expert from testifying because again, he raised things that were not part of supplementation, but were in fact a whole new theory with regard to why he believed that Beverly's income should be increased going all the way back to 2016 and 2017. Information that was available to Jeffrey's expert long before even the May 2019 court date. So it wasn't speculative at all. And in fact, he asked for relief from the trial judge at that point in time later on with regard to that. Now, one of the things that the trial judge found was not just you've been told about how Beverly's income was understated and she had deductions for things that weren't a proper deduction. The judge made finding that both parties' incomes were inaccurate. And we're not disputing that both parties' incomes were inaccurate. What we're disputing is the disparate treatment between Mr. Kunzmiller's income and Beverly's. And the reason for the disparity is unclear other than to say that the disparity exists because for Beverly's income, the judge used gross receipts. For Jeffrey's income, the judge used gross income, giving allowance for deductions that the judge believed were reasonable, as pointed out by Susan Young, the expert for Beverly in the case. So it wasn't about the fact that both of them were not being forthcoming with respect to their income and even in their tax returns. It's about the fact that they were given different treatments for the purposes of calculating that. With regard to the college education expenses, I specifically point to page 37 and 38 of my brief where I point out that and Mr. Garavaglia indicated there was an affidavit with respect to the expenses. That's true. Behind the affidavit was the grades for the child's semesters that we were asking for fall 2018, spring 2019, and winter 2019. All that information was listed immediately behind that affidavit. And the student loans at the top of the next page on page 38 of my brief, I point out the student loans the child had taken out, including the exact amount of each loan, plus the costs of the college were provided in support of the affidavit right there in Exhibit 20. So that information was before the court. Certainly, the court had the incomes of the parties. That's what the majority of this case was about. So the court wasn't missing any income with respect to the parties. The court had exactly what it needed to make a decision. I don't know if the court simply didn't look behind the affidavit and see that the grades and the student loans were listed there or if she missed it or what the problem was. But anyway, we're asking for reversal on that issue. And then with regard to the issue of sanctions, as indicated earlier, the purpose of sanctions is in order to get compliance. And if they had raised the issue of sanctions earlier in the case, there are other ways that they could have gotten that testimony. They could have gotten it from all of the people who worked for Beverly, and they could have gotten statements. They could have gotten affidavits. They could have gotten time frames at which they worked there to get the information they needed. But because they didn't raise it timely, it's gone. And there's no remedy at this point in time. Thank you. Thank you, counsel. Any questions, Justice Vaughn? No questions. Thank you. Justice Welch? No questions. Mr. Garavaglia, this is a cross appeal. You'll have five minutes in rebuttal. Thank you, Your Honor. The starting with Mr. Gruner's last point first, I suppose, regarding the timeliness of the complaint of the destruction of evidence by Ms. Kunzmiller. I mean, some of that was disclosed on the witness stand during the trial in this matter. She was asked, I mean, and shown references to the request for production that had been submitted in this case, and also a Rule 237B notice that clearly put her on notice, not that we wanted this information, and also that she was to supplement and bring it to court with her. And she'd seen that. And as I recall, the 237B notice was dated August of the January before the second day of hearing in this case. And her testimony was that after even having received the August notice, she continued to destroy these records we were seeking. How in the world could we have known that earlier? And even more importantly, a party doesn't have a right to destroy documents that are evidence that have been requested in discovery and then complain the other party can get it from someone else and should have done that. This is a burden shift. The responsibility to comply with discovery was Ms. Kunzmiller's. And the fact that not only did she not comply with discovery, but then spoiled, committed parties is really outlandish. But I mean, that is her argument. And with regard to the disparity in treatment between the two parties, I mean, while it is in fact the case, the court said that they both weren't credible in certain respects. I mean, there is some false equivalency going on here. And one of the reasons for that is, as mentioned previously, Beverly's own expert offered no opinion as to Beverly's income. Why that decision was made, I don't know. But if Beverly's own expert had said, you know, this is Beverly's business income and these are appropriate deductions to be taken, this is business income that should be treated as personal income to Ms. Kunzmiller and these are deductions that are improper, that would be proper, we'd be having a different discussion here. But she didn't do that. She didn't elicit that information from her own expert. And with regard to the college expenses, again, there is an exhibit that was entered into evidence that is true. It consists of hearsay documents, correspondence, invoices, and so forth from a university and an unsigned affidavit that bears a signature line for one of the children that was never signed. That being the case, we would ask that this court give it no more weight than the trial court did and just simply affirm the court's decision to deny the request for college expenses. I do have a little over a minute left. That's all I indicated or wanted to say. If there are any questions, I'd be happy to entertain them, obviously. Questions, Justices? No questions. No other questions. Thank you. Well, thank you, Counsel. The court will take the matter under advisement and issue its decision in due course. Thank you, Honor. Thank you, Dan.